| | | |
|---|---|---|
| EARL JAMES WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| PAULA SMITH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** is before the Court on initial review of Plaintiff's Complaint, (Doc. No. 1). He is proceeding *in forma pauperis*, (Doc. Nos. 6). Also pending is a Motion to Appoint Counsel, (Doc. No. 3).

## I.      BACKGROUND

*Pro se* Plaintiff has filed a civil rights suit pursuant to 42 U.S.C. § 1983 while incarcerated at the Albemarle Correctional Institution. The Complaint addresses events that allegedly occurred at the Catawba Valley Medical Center ("CVMC"), Alexander C.I., Central Prison, and Albemarle C.I. He names as Defendants: Director of Medical Services for North Carolina Department of Public Safety ("NC DPS") **Paula Smith**; Albemarle C.I. Administrator **Jack Clelland**; Albemarle C.I. Assistant Superintendent of Custody/Operations **Kenneth Diggs**; Albemarle C.I. Assistant Superintendent of Programs **William Glick**; Albemarle C.I. Assistant Superintendent of Custody/Operations **Lawrence Parsons**; Albemarle C.I. Medical Doctor **Leonard F. Polanco**; Albemarle C.I. Nurse Practitioner **Stephanie Brathwaite**; Albemarle C.I. Nurse **April Foreman**; Albemarle C.I. Correctional Officer **Rhonda Morton**; Albemarle C.I. Lieutenant **FNU Brewton**; Albemarle C.I. Lieutenant **FNU Randle**; Albemarle C.I. Unit Manager **FNU Bowden**; Albemarle

1

C.I. Sergeant **FNU Murphy**; Albemarle C.I. Correctional Officer **FNU Frick**; Albemarle C.I. Nurse **FNU Mundle**; CVMC Director **Eddie Beard**; CVMC **Nurse Jane Doe**; CVMC **Nurse Jane Doe 2**; Carolina Orthopedic Specialists[1] Director **Sean McNally**; Carolina Orthopedic Specialists Surgeon **Alfred E. Geissele**; Carolina Orthopedic Specialists Nurse Practitioner **Steve McFarland**; CVMC Anesthesiologist **Frank E. Rinaldo, Jr.**; Alexander C.I. Medical Doctor **Marta M. Kalinski**; Alexander C.I. Medical Doctor **FNU Quinn**; Alexander C.I. Medical Doctor **FNU Chung**; Alexander C.I. Physical Therapist **FNU Ford**; Alexander C.I. **Correctional Officer John Doe**; and Alexander C.I. **Correctional Officer Jane Doe**.

Construing the Complaint liberally and accepting the allegations as true, Defendants Frick and Morton transported Plaintiff to CVMC on September 23, 2015, for scheduled back surgery. They arrived late and, as a result, Plaintiff's surgery was delayed until the end of the day. Plaintiff told Frick and Morton that he "felt like he was on death row waiting to go to his execution." (Doc. No. 1 at 12-13). Nurses looked at Plaintiff's tattoo during preoperative procedures. Before surgery, Nurse Jane Doe 1 gave Plaintiff medication ordered by Defendant McFarland. (Doc. No. 1 at 13). At 5:00 PM, Plaintiff was pushed into what appeared to be a laundry room while Jane Doe 1 led Frick and Morton away, leaving Plaintiff unattended by prison staff in violation of NC DPS policy. While Defendant Rinaldo stood beside Plaintiff, Defendant McFarland grabbed Plaintiff's head and struck Plaintiff's chin with a blunt metal object. Plaintiff was unable to defend himself or call for help because of the medication he had been given. Nurse Jane Doe 2 called out "Steve!?!" (Doc. No. 1 at 14). Defendant McFarland pinned Plaintiff's arms back and pinned Plaintiff's head to his chest, causing excruciating pain in Plaintiff's upper back, neck, and chest. McFarland

---

[1] Also known as "Emerge."

speculated that Plaintiff's tattoo was a memorial to women he had raped, said he was going to "fix" Plaintiff "so we don't ever have to worry about that again," and told Plaintiff that his surgical scar would not be as small as promised. (Doc. No. 1 at 14). Rinaldo pulled Plaintiff's leg shackles with all his might and repeatedly drove his elbow into Plaintiff's left knee. Rinaldo pressed his fingers into Plaintiff's scrotum, flipped him over, and pushed his fingers into Plaintiff's anus which damaged his prostate and left him impotent. Plaintiff felt a dull metal object about an inch in diameter hitting his feet, ankles, lower legs, and knees, which left permanent blue marks on them. Plaintiff was in excruciating pain and lost consciousness.

Plaintiff regained consciousness after surgery when he was wheeled to a hospital room. Defendants Frick and Morton had already left the hospital and Plaintiff was afraid for his life. He immediately complained to CVMC nurses and NC DPS officers John and Jane Doe about the excruciating pain throughout his body. He was given oxycodone for pain. Defendant Geissele discharged Plaintiff from CVMC on September 25, 2015, with medical restrictions on lifting, bending, and twisting, and orders that Plaintiff be housed in an infirmary rather than the general population and that he return for a follow-up in two weeks. Plaintiff was transported back to Alexander C.I. in handcuffs, waist chain, and leg shackles in a car which caused him excruciating pain.

When Plaintiff arrived at Alexander C.I. after surgery, Plaintiff told Defendants Kalinski and Quinn about his injuries and pain. Kalinski felt the lump on Plaintiff's chin and he told her that he lost rectal and bladder control. She offered him diapers.

On September 29, 2015, Plaintiff told Defendant Ford, a PREA contact, that he would like to talk to him. They met a few days later and Plaintiff told Ford about the September 23 assaults in detail, but Ford did not report them.

On October 2, 2015, the infirmary nurse let Plaintiff's pain medication run out which left him to suffer excruciating pain until it was renewed after October 5, 2015.

On October 6, 2015, Plaintiff was transported for his two-week checkup. When he realized he would see McFarland he asked NC DPS officers not to leave him alone. Plaintiff showed McFarland the blue chain-like marks on his feet, the lump on his chin, and his pain and injuries. McFarland said "you haven't been under my care, I don't know what happened to you." (Doc. No. 1 at 20). McFarland ordered the continuation of Plaintiff's pain medication and ordered six additional weeks in the infirmary and another follow-up in six weeks.

Plaintiff's parents called CVMC, Alexander C.I., and Raleigh for weeks beginning on or about October 9, 2015, to get accurate information about what happened to Plaintiff and his condition. They were given the run-around and were hung up on when they asked about Plaintiff's allegations.

On October 10, 2015, Plaintiff requested sick call to speak with someone in mental health about the September 23 assault.

Defendant Chung closed the infirmary at Alexander C.I. on October 13, 2015. "[U]pon information and belief … Defendant Chung … did not want to care for inmates in the infirmary" and closed the infirmary at Alexander C.I. because of Plaintiff's parents' phone calls, Plaintiff told Ford about the assaults, and Plaintiff requested mental health. (Doc. No. 1 at 21-22). According to the nurses in the infirmary, the infirmary did not need to close "because an emergency response was set up with CVMC." (Doc. No. 1 at 22).

Plaintiff was transferred from Alexander C.I. to Central Prison on October 13, 2015, by two Alexander C.I. officials in a van, which caused excruciating pain during the three-hour trip.

(Doc. No. 1 at 28). Upon arriving at Central Prison's ER, none of the staff knew who Plaintiff was, where he had come from, or why he was sent there. He was placed in a 23-hour holding cell without access or visitation. A doctor eventually saw Plaintiff that night and cut his pain medication from 10 mg every four hours to 5 mg every six hours. On October 15, 2015, a doctor ordered that Plaintiff be kept out of general population for the next 21 days (12 days less than McFarland had ordered). Plaintiff's pain level was 9 out of 10 so the doctor raised the pain medication to 5 mg every four hours. On October 21, 2015, Central Prison officials discharged Plaintiff from the hospital and attempted to release him into general population. Plaintiff explained his need for infirmary housing and the use of the walker and he was allowed to remain in the 23-hour holding cell. Plaintiff was told to pack up on October 26, 2015, because Plaintiff was going back where he came from.

However, instead of returning to Alexander C.I., Plaintiff was sent to Albemarle C.I. in a bus, which caused him excruciating pain. Upon arriving at Albemarle C.I., officers had to lift Plaintiff by his arms to get him off the bus which caused excruciating pain. Plaintiff immediately informed Defendants Brewton, Murphy, and Mundle that doctor's orders stated he was supposed to be out of the general population and in the infirmary and that he was in a lot of pain. Plaintiff was placed in the general population based on his "acuity level" change from level 4 to 2 even though he was still supposed to be in an infirmary; Defendant Mundle told Plaintiff there was nothing that could be done about it. (Doc. No. 1 at 30). Plaintiff's requests for help and pleas about pain were ignored and he was placed in the general population. Plaintiff went to the window for pain medication on October 26, 2015, and Nurse Goins was "rude and hateful" when Plaintiff asked for his pain medication. (Doc. No. 1 at 34). She said "you have done gobbled up thirty pills

you don't have nothing to take" and she refused to give him Tylenol or anything. (Doc. No. 1 at 34). Plaintiff was unable to sleep due to pain throughout his body that night and on many other nights.

Plaintiff was initially assigned to a housing unit that has handicapped facilities but he was moved to Badin Unit after speaking to Mundle. Plaintiff immediately put in a sick call about the improper change in his health level from 4 to 2.

On October 30, 2015, Nurse Witaker found the October 15 doctor's order about keeping Plaintiff in the infirmary rather than general population. Witaker informed Randle, who placed Plaintiff in segregation. Plaintiff explained that segregation is not the same as an infirmary and said that he wanted to go to either Salisbury or Alexander C.I. Randle said he could not do that and he had already spoken to Parsons about the situation, who said "Earl Waston will not go to segregation." (Doc. No. 1 at 33). Randle said Parsons knew that Plaintiff was supposed to be in the infirmary pursuant to doctor's orders. On November 3, 2015, Plaintiff filed a grievance about being improperly discharged from the infirmary and being sent to general population against doctor's orders.

During sick call on October 31, 2015, Plaintiff discovered that there was 625 mg of Tylenol in his self-medication bag that Kalinski had ordered for him on September 25, 2015. Medical staff did not give Plaintiff the Tylenol for his pain.

On November 2, 2015, the sick call list indicated that Plaintiff had an appointment, but the list then disappeared. When Plaintiff went to medical to ask about his appointment, Nurse Bamburger said there was no sick call for him, it must be lost, and he should put in another request.

On November 3, 2015, Plaintiff filed a grievance about being improperly discharged from

the infirmary and being returned to general population against doctors' orders and appealed to the highest level.

On November 9, 2015, Plaintiff was seen by Defendant Polanco, whom Plaintiff told he was still supposed to be in the infirmary, that his rectal muscles were damaged, that he was having trouble holding his urine, and that he could not sleep because his pain was 9 out of 10. Polanco examined Plaintiff's back and saw the surgical scar was healed and stated "all that don't matter, you're healed up." (Doc. No. 1 at 22). Polanco refused to look at the blue marks on Plaintiff's ankle and foot.

On November 11, 2015, Plaintiff wrote a letter to NC Prisoner Legal Services about filing a civil case regarding the deprivation of rights and medical needs, and his case was declined.

Plaintiff submitted another grievance about the violation of his rights after his back surgery, not being kept in the infirmary, receiving no prescribed pain medication, and requesting self-medication on November 18, 2015.

On November 20, 2015, Plaintiff was transferred to "Emerge" by Frick and Catoe. Plaintiff asked the officers not to leave him alone. Plaintiff told Geissele and McFarland that he had been taken out of the infirmary weeks too early, that his pain level was 8 out of 10, and he was not being given oxycodone at Albemarle C.I. Geissele ordered 30 more days of walker use and oxycodone. At Albemarle C.I., Plaintiff periodically reported to the pain medication window to see if the medication that Geissele ordered had arrived. He also put in a sick call request for the medication on November 27, 2015. He filed a grievance and appealed the response because he still had not received a narcotic pain medication. He saw Nurse Ojeda on November 30, 2015, and she scheduled him to see a provider the next day but that never happened. On December 1, 2015, Plaintiff asked Sergeant Mullins whether the grievance unit response said that he had a narcotic at

the pain medication window and he said yes. Mullins called Bamburger who said Plaintiff did not have a narcotic and that he had not received any since he was in Central Prison in October. Plaintiff went to the medication window on December 4 and 7 but Nurse Robinson told him on both occasions that there was no medication for him. As of December 9, Plaintiff had not seen a provider or received his medication so he filled out another sick call request and wrote a letter to Defendants Clelland, Parsons, and Glick. Clelland wrote a response saying he could not address why Plaintiff was transferred back to that facility. On December 11, 2015, Nurse Byrd wrote a response saying Plaintiff saw Polanco on November 3, that he had been ordered Tylenol and Meloxicam and that the Meloxicam had been cancelled at Plaintiff's request. Plaintiff explained he refused the Meloxicam because he is allergic to NSAIDs. On December 16, 2015, Plaintiff was told to go to medical. Nurse Maine said she was trying to address his December 9 sick call regarding pain medication but she was unable to log into the computer. Nurse Barrier took over and found the doctors' orders about holding Plaintiff in the infirmary and providing oxycodone within minutes. Brathwaite then entered an order for oxycodone. Nurse Maine asked Plaintiff to sign a refusal of the December 9 sick call but Plaintiff said no. Maine and Ojeda signed the refusal without Plaintiff's authorization. Plaintiff finally received oxycodone on December 16. When Plaintiff showed Brathwaite his left foot and ankle on December 16, she said they looked badly bruised. When Plaintiff said the marks match the links on leg shackles she ordered Plaintiff to leave.

On May 7, 2017, Plaintiff put in a request to see psychologist Guignard and gave her the grievance he had prepared about the September 23 assaults. Guignard told Plaintiff to submit the grievance with the facility head, Defendant Glick. See (Doc. No. 1-1 at 6). She diagnosed Plaintiff with PTSD.

A preliminary PREA investigation was conducted by Defendant Brewton with Defendant

Bowden acting as Plaintiff's PREA support person. Plaintiff's allegations were met with derision and disbelief. The PREA investigation was meant to cover up the assaults rather than hold the perpetrators accountable. Photographs were not taken and the PREA investigators did not try to determine if Frick and Morton's actions contributed to the assaults. The PREA investigation was in direct conflict with PREA policy and procedures and amounted to a civil conspiracy to conceal evidence of Plaintiff's injuries. The PREA investigator concluded that the allegations do not rise to the level of a PREA violation, and Plaintiff's grievance about the September 23 incident was denied. <u>See</u> (Doc. No. 1-1 at 11). Plaintiff filed a grievance about the PREA investigation and medical examination by Defendants Foreman and Brathwaite but it was rejected for addressing more than one incident. (Doc. No. 1-1 at 13). He filed another grievance alleging that the PREA investigation was based on falsified and inaccurate medical records and an inadequate medical examination. <u>See</u> (Doc. No. 1-1 at 16). The institution found that staff adequately addressed Plaintiff's concerns and considered the grievance resolved. <u>See</u> (Doc. No. 1-1 at 17).

When Defendants failed to provide Plaintiff with safety and treat his medical needs he suffered unnecessary and wanton physical and mental pain and a decline in his health. Plaintiff believes that his prostate was damaged in the September 23 attack which left him impotent, and that the catheter was placed too deeply and caused scarring. He has trouble holding his urine, feels like he has to urinate all the time, and had trouble emptying his bladder. Plaintiff has pain in his testicles from the assault. His rectal muscles were damaged and he has lost rectal control from the injuries he sustained in the attack. His feet, ankles, and lower legs have nerve damage and sharp pain. His has "drop foot" on his left side from overstretched ligaments and tendons. (Doc. No. 1 at 26). At times his left knee gives out while standing and walking. His lower back is "dead" with sharp pains and popping where the surgery was performed. (Doc. No. 1 at 27). He can sense the

metal that was placed in his back during surgery. Both hips have nerve damage and are numb. The left side of his chest has a possible pectoral tear and nerve damage. He has pain in the back of his neck between his shoulders. In addition to the physical pain and injuries, he has suffered mental and emotional anguish, distress, fright, fear, shock, nightmares, and humiliation.

Plaintiff seeks declaratory judgment, preliminary and permanent injunction, institution of criminal charges against the Defendants, compensatory and punitive damages, jury trial, cost and fees, and any additional relief the Court deems just and equitable.

## II.      MOTION TO APPOINT COUNSEL

There is no absolute right to the appointment of counsel in civil actions such as this one. Therefore, a plaintiff must present "exceptional circumstances" in order to require the Court to seek the assistance of a private attorney for a plaintiff who is unable to afford counsel.  Miller v. Simmons, 814 F.2d 962, 966 (4th Cir. 1987).

In his Motion to Appoint Counsel, Plaintiff argues that he cannot afford to hire counsel, his imprisonment will greatly limit his ability to litigate this case, the issues will require significant research investigation and discovery, the issues are complex, counsel would help Plaintiff apply the law properly, Plaintiff has no access to a law library and has never before been a party to a civil legal proceeding, a trial will likely involve conflicting testimony and counsel would be better able to present evidence and cross-examination, Plaintiff has made repeated efforts to obtain counsel.

This case does not present exceptional circumstances that justify appointment of counsel. Therefore, Plaintiff's Motion for Appointment of Counsel will be denied.

## III.      SCREENING STANDARD OF REVIEW

Because Plaintiff is a prisoner proceeding *in forma pauperis*, the Court must review the

Complaint to determine whether it is subject to dismissal on the grounds that it is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). In its frivolity review, a court must determine whether the Complaint raises an indisputably meritless legal theory or is founded upon clearly baseless factual contentions, such as fantastic or delusional scenarios. Neitzke v. Williams, 490 U.S. 319, 327-28 (1989). A complaint should not be dismissed for failure to state a claim "unless 'after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)).

A *pro se* complaint must be construed liberally. Haines v. Kerner, 404 U.S. 519, 520 (1972); see also Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009) ("Liberal construction of the pleadings is particularly appropriate where … there is a *pro se* complaint raising civil rights issues."). However, the liberal construction requirement will not permit a district court to ignore a clear failure to allege facts in his complaint which set forth a claim that is cognizable under federal law. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990). A *pro se* complaint must still contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007); see Ashcroft v. Iqbal, 556 U.S. 662 (2009) (the Twombly plausibility standard applies to all federal civil complaints including those filed under § 1983). This "plausibility standard requires a plaintiff to demonstrate more than a sheer possibility that a defendant has acted unlawfully." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted). He must

articulate facts that, when accepted as true, demonstrate he has stated a claim entitling him to relief. Id.

## IV. DISCUSSION

**(1) Parties**

The Federal Rules of Civil Procedure provide that, "[i]n the complaint the title of the action shall include the names of all the parties." Fed. R. Civ. P. 10(a); see Myles v. United States, 416 F.3d 551 (7th Cir. 2005) ("to make someone a party the plaintiff must specify him in the caption and arrange for service of process."). Although *pro se* litigants are entitled to have their pleadings liberally construed, Haines, 404 U.S. at 520, "[d]istrict judges have no obligation to act as counsel or paralegal to *pro se* litigants," Pliler v. Ford, 542 U.S. 225 (2004).

The body of the Complaint contains allegations against individuals who are not named as defendants in the caption as required by Rule 10(a). This failure renders Plaintiff's allegations against them nullities. See, e.g., Londeree v. Crutchfield Corp., 68 F.Supp.2d 718 (W.D. Va. Sept. 29, 1999) (granting motion to dismiss for individuals who were not named as defendants in the compliant but who were served). The allegations directed at individuals not named as Defendants are therefore dismissed without prejudice.

**(2) Vague and Conclusory Claims**

Plaintiff makes a number of allegations that are not attributed to any of the named Defendants or which are too vague and conclusory to establish that a violation of Plaintiff's rights occurred. Such allegations have failed to state a claim upon which relief can be granted and therefore will be dismissed. See Fed. R. Civ. P. 8(a)(2) (short and plain statement is required); Simpson v. Welch, 900 F.2d 33, 35 (4th Cir. 1990) (conclusory allegations, unsupported by specific allegations of material fact are not sufficient); Dickson v. Microsoft Corp., 309 F.3d 193, 201-02

(4th Cir. 2002) (a pleader must allege facts, directly or indirectly, that support each element of the claim).

**(3)**     **Cruel & Unusual Punishment**

The Eighth Amendment prohibits punishments that "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment," Helling v. McKinney, 509 U.S. 25, 31 (1993). Knowing of, but disregarding, an excessive risk to an inmate's health or safety is referred to as deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 837 (1994) (internal quotations omitted). A prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious," Wilson v. Seiter, 501 U.S. 294, 298 (1991); see also Hudson v. McMillian, 503 U.S. 1, 5 (1992), and must result in the denial of "the minimal civilized measure of life's necessities," Rhodes v. Chapman, 452 U.S. 337, 347 (1981). The second requirement is that a prison official must have a "sufficiently culpable state of mind." Wilson, 501 U.S. at 297, 302-03; Hudson, 503 U.S. at 5, 8.

**(a)**     **Excessive Force**

"[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." Hudson, 503 U.S. 1, 4 (1992); see Wilkins v. Gaddy, 559 U.S. 34, 34 (2010). The "core judicial inquiry," is not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson, 503 U.S. at 7. "When prison officials maliciously and sadistically use force to cause harm," the Court

recognized, "contemporary standards of decency always are violated ... whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." Hudson, 503 U.S. at 9, 13–14.

The Fourth Circuit addresses a failure to intervene claim as a theory of "bystander liability" wherein there is "an omission to act...coupled with a duty to act." Randall v. Prince George's Cnty., 302 F.3d 188, 202 (4th Cir. 2002). A "bystander officer" could be liable for his or her nonfeasance if he or she: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Id. at 204. However, if no excessive force is applied by the fellow officer, the officer witnessing the conduct "cannot be held liable under bystander liability for a failure to intervene." Howie v. Prince George's Cnty., 2009 WL 2426018 at *6 (D. Md. Aug. 5, 2009); see also Jarvis v. Securitas Sec. Servs. USA, 2012 WL 527597 (D. Md. Feb. 16, 2012).

Plaintiff alleges that Defendants McFarland and Rinaldo willfully, maliciously, and sadistically beat him while he was shackled, sedated, and unable to defend himself. He claims that they beat him because they thought his tattoo signified that he had committed rape and/or because they knew he had been convicted of rape. The beating left him with permanent serious physical injuries and emotional anguish. He claims that Defendants Geissel, McFarland, Rinaldo, Kalinski, Polanco, Brathwaite, Foreman, Brewton, Randle, Bowden, Mundle, Quinn, Chung, Ford, Nurse Jane Does 1 and 2, Officer John Doe, and Officer Jane Doe knew about the injuries.

Plaintiff has stated a plausible excessive force claim against Defendants McFarland and Rinaldo for allegedly beating him while he was shackled and sedated. He also states a minimally

sufficient claim against Nurse Jane Doe 2 for failure to intervene. However, he has not stated a claim against Defendants Geissel, McFarland, Rinaldo, Kalinski, Polanco, Brathwaite, Foreman, Brewton, Randle, Bowden, Mundle, Quinn, Chung, Ford, Nurse Jane Doe 1, Officer John Doe, and Officer Jane Doe. He does not allege that these individuals exercised any force against him or were present and failed to intervene. Therefore, Plaintiff's excessive force/failure to intervene claim will proceed against Defendants **McFarland** and **Rinaldo**, and **Nurse Jane Doe 2**, and will be dismissed as to the other Defendants.

**(b)** **Failure to Protect**

To obtain relief under § 1983 on a claim of failure to protect, an inmate must show: (1) "serious or significant physical or emotional injury" resulting from that failure; and (2) the prison officials had a "sufficiently culpable state of mind," which in this context is deliberate indifference. Farmer, 511 U.S. at 834. A prison official is "deliberately indifferent to a substantial risk of harm to a [prisoner] when that [official] 'knows and disregards' the risk." Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 302 (4th Cir. 2004) (quoting Farmer, 511 U.S. at 837). "It is not enough to prove that the official should have known of the risk; instead, 'the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he should draw the inference.'" Kartman v. Markle, 582 Fed. Appx. 151, 153 (2014) (quoting Farmer, 511 U.S. at 837). A showing of negligence does not rise to the level of deliberate indifference. Davidson v. Cannon, 474 U.S. 344, 347-48 (1986).

A prison official's subjective actual knowledge can be proven through circumstantial evidence, for example, that the "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and

thus 'must have known' about it." <u>Farmer</u>, 511 U.S. at 842. Direct evidence of actual knowledge is not required. <u>Id.</u> A prison official cannot escape liability for deliberate indifference by showing that, "while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." <u>Farmer</u>, 511 U.S. at 843. The question is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health… and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." <u>Id.</u> However, because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware of an obvious risk to inmate health or safety. For example, they may show "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." <u>Farmer</u>, 511 U.S. at 844. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, "even if the harm was not averted" because a prison official's duty is to ensure "reasonable safety." <u>Id.</u> (quoting <u>Helling v. McKinney</u>, 509 U.S. 24, 33 (1993)). This standard "incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" <u>Id.</u> (quoting <u>Spain v. Procunier</u>, 600 F.2d 189, 193 (9th Cir. 1979) (Kennedy, J.). Absent successful rebuttal, prison officials may be held liable for obvious risks they must have known. <u>Makdessi v. Fields</u>, 789 F.3d 126, 133 (4th Cir. 2015) (citing <u>Farmer</u>, 511 U.S. at 842).

Plaintiff alleges that Defendants Frick and Morton failed to adequately supervise him, provide for his safety, use reasonable care in protecting him from assault. According to Plaintiff, these Defendants were responsible for transporting him from Albemarle C.I. to CVMC for surgery. They did so, then waited with him until it was time for his surgery. They walked down the hallway with the gurney then followed a nurse while Plaintiff was handed off for surgery to Nurse Practitioner McFarland and Anesthesiologist Rinaldo. Plaintiff alleges that his statement while waiting for his back surgery that he felt like he was on death row waiting to go to his execution gave them actual knowledge that he was in danger and in fear and expected to die. They failed to act on this knowledge of a substantial risk of serious harm and, as a result, failed to protect him from the assault at the hands of McFarland and Rinaldo.

Plaintiff has failed to state a plausible deliberate indifference claim against Defendants Frick and Morton. Plaintiff fails to explain how these Defendants could have known that members of his medical team were going to assault him. Plaintiff's statement in the waiting room that he felt like he was on death row reasonably conveyed Plaintiff's fear of surgery, not fear of assault. He fails to explain how either Defendant knew that Plaintiff risked assault by his medical team, indeed, Plaintiff's allegations suggest that the assault was a surprise to him. He has failed to allege that Frick and Morton knew of any risk of assault to Plaintiff by the medical team and he does not allege that they were not actually present when any assaultive behavior occurred. Therefore, Plaintiff has failed to state a claim against Defendants Frick and Morton and the Complaint will be dismissed as to them.

(c)     **Medical Deliberate Indifference**

Deliberate indifference to serious medical needs of prisoners "constitutes the unnecessary

and wanton infliction of pain proscribed by the Eighth Amendment." Estelle, 429 U.S. at 104 (citation and internal quotation marks omitted). The deliberate indifference standard has two components. The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry. See Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. at 241 (internal quotation marks omitted). An actionable deliberate indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a "substantial risk of serious harm." Farmer, 511 U.S. at 837; see also Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997) (deliberate-indifference standard requires prisoner to "produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions, or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions" (citation omitted)). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (citing Gittlemacker v. Prasse, 428 F.2d 1, 6 (3d Cir. 1970)). A mere delay or interference with treatment can be sufficient to constitute a violation of the Eighth Amendment. Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009). In such cases, in addition to establishing that his medical need was objectively serious, a plaintiff also must show that the delay in providing medical care caused him to suffer "substantial harm." Webb v. Hamidullah, 281 Fed. Appx. 159, 166 (4th Cir. 2008).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable § 1983 claim. Estelle, 429 U.S. at 106. To

be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety." <u>Farmer</u>, 511 U.S. at 837; <u>Johnson v. Quinones</u>, 145 F.3d 164, 167 (4th Cir. 1998). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." <u>Stokes v. Hurdle</u>, 393 F. Supp. 757, 762 (D. Md. 1975), *aff'd*, 535 F.2d 1250 (4th Cir. 1976).

Plaintiff alleges that Defendants Kalinski, Polanco, Brathwaite, Foreman, Brewton, Randle, Bowden, Mundle, Quinn, Chung, and Ford purposefully and recklessly failed to provide him with adequate medical assistance and access to medical care after he was assaulted by Defendants McFarland and Rinaldo. He claims that their actions and omissions show a longstanding pattern of deliberately ignoring, denying, and delaying medical treatment to Plaintiff. He claims that the lack of treatment caused him further injury and physical and emotional pain.

The deliberate indifference claims will be permitted to proceed against Defendants **Kalinski, Polanco, Brathwaite, Foreman, Brewton, Randle, Bowden, Mundle, Quinn, Chung,** and **Ford**. However, Plaintiff has failed to state a deliberate indifference claim against April Foreman, against whom he makes no specific factual allegations to support a deliberate indifference claim. The deliberate indifference claim will therefore be dismissed as to Defendant Foreman.

(4)     <u>**PREA**</u>

The Prison Rape Elimination Act, ("PREA"), 42 U.S.C. §§ 3031, *et seq.*, seeks to establish "zero-tolerance" for the incidence of prison rape. 42 U.S.C. § 30302(1). "[S]ection 1983 itself creates no rights; rather it provides a method for vindicating federal rights elsewhere conferred."

Doe v. Broderick, 225 F.3d 440, 447 (4th Cir. 2000) (internal citations omitted). "[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." Gonzaga Univ. v. Doe, 536 U.S. 273, 286 (2002). Nothing in the PREA suggests that Congress intended to create a private right of action for inmates to sue prison officials for noncompliance with the PREA. See De'Lonta v. Clarke, 2012 WL 4458648 at *3 (W.D. Va. Sept. 11, 2012) ("Nothing in the PREA suggests that Congress intended to create a private right of action for inmates to sue prison officials for noncompliance with the Act."), *aff'd* De'Lonta v. Pruitt, 548 Fed. Appx. 938 (4th Cir. 2013); see also Chapman v. Willis, 2013 WL 2322947 at *4 (W.D. Va. May 28, 2013). Nor does a prisoner have a constitutional right to a PREA investigation. See generally DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 196 (1989) ("The Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.")); see, e.g., Wise v. Wilson, 2017 WL 71656 (E.D. Va. Jan 6, 2017) (prisoner has no constitutional right to have a PREA complaint investigated).

Plaintiff appears to allege that Defendants Brewton, Bowden, Foreman, and Braithwaite conducted an inadequate PREA investigation which violated the PREA and resulted in an inaccurate PREA report. He claims that Defendants purposefully misrepresented medical records and failed to accurately document Plaintiff's injuries during the PREA investigation for the purpose of concealing Plaintiff's injuries. Plaintiff alleges that Lieutenant Brewton conducted a preliminary PREA investigation at Albemarle C.I. after Plaintiff told a psychologist about the September 23, 2015, assaults. Plaintiff alleges that his allegations were met with derision and

disbelief, medical records were falsified and manipulated, photographs were not taken, the investigation failed to include an effort to determine whether Frick and Morton's actions contributed to the assaults, Plaintiff wrote a grievance about the PREA examination and investigation.

There is no private cause of action for a PREA violation and a prisoner has no constitutional right to a PREA investigation. Therefore, this claim will be dismissed as frivolous. See Krieg v. Steele, 599 Fed. Appx. 231 (5th Cir. 2015) (dismissing as frivolous prisoner's argument that his rights under the PREA were violated because other courts have found that the PREA does not establish a private cause of action for allegations of prison rape and plaintiff cited no case in support of his position); Swanson v. Gaston Co. Sheriff's Ofc., 2018 WL 4052168 (W.D.N.C. Aug. 24. 2018) (dismissing prisoner's PREA claim as frivolous).

**(5)**      **Retaliatory Transfer**

Plaintiff does not have a federally protected liberty interest in any particular housing or classification unless it exceeds the scope of his original sentence and imposes an atypical and significant hardship in relation to the ordinary incidents of prison life. See Sandin v. Conner, 515 U.S. 472 (1995). "[C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation) and the denial of privileges … are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage prisons safely and efficiently." Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991) (*en banc*).

However, prison officials may not retaliate against an inmate for exercising a constitutional right. See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir. 1978). To succeed on such a claim,

a plaintiff must first allege that "the retaliatory act was taken in response to the exercise of a constitutionally protected right...." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). Thereafter, a plaintiff must demonstrate that he suffered some adverse impact or actual injury. See Am. Civ. Libs. Un. of Md., Inc. v. Wicomico Cnty., 999 F.2d 780, 785 (4th Cir. 1993) (citing Huang v. Board of Governors of Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990)). In addition, a plaintiff must come forward with specific evidence "establish[ing] that but for the retaliatory motive the complained of incident[s] ... would not have occurred." Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995); accord Ponchik v. Bogan, 929 F.2d 419, 420 (8th Cir.1991) (plaintiff must show that action would not have occurred "but for" the alleged reprisal); Collinson v. Gott, 895 F.2d 994, 1002 (4th Cir. 1990) (Phillips, J., concurring); McDonald v. Hall, 610 F.2d 16, 18–19 (1st Cir.1979). In the prison context, such claims are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994).

As a general matter, a criminal defendant has no basis for complaint when he is transferred from one institution to another; the fact that life in one prison might be more disagreeable than in another is alone insufficient to warrant due process protections. Meachum v. Fano, 427 U.S. 215 (1976); see Montanye v. Haymes, 427 U.S. 236 (1976) (the due process clause does not require hearings in connection with transfers, whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive). However, transfers may be judicially challenged when they are retaliatory or are used as a means of punishing the exercise of constitutional freedoms. See Montanye, 427 U.S. at 242. To successfully argue retaliatory transfer in violation of his constitutional rights pursuant to § 1983, a plaintiff "must prove that a desire to retaliate was

the actual motivating factor behind the transfer." Goff v. Burton, 91 F.3d 1188, 1191 (8th Cir.1996). In other words, the plaintiff must prove that but for his protected First Amendment activity, he would not have been transferred. Rouse v. Benson, 193 F.3d 936, 940 (8th Cir. 1999).

Plaintiff alleges that Defendant Chung closed the infirmary at Alexander C.I. on October 13, 2015, after Plaintiff's parents made phone calls about his treatment and condition, Plaintiff told Defendant Ford about the physical and sexual assaults, and Plaintiff asked to speak with someone in mental health about the assaults. "[U]pon information and belief … Defendant Chung … did not want to care for inmates in the infirmary" and closed the infirmary at Alexander C.I. because of Plaintiff's parents' phone calls, Plaintiff told Ford about the assaults, and Plaintiff requested mental health. (Doc. No. 1 at 21-22). According to the nurses in the infirmary, the infirmary did not need to close "because an emergency response was set up with CVMC." (Doc. No. 1 at 22). Plaintiff was transferred from Alexander C.I. to Central Prison on October 13, 2015. (Doc. No. 1 at 28). Plaintiff was discharged from the Central Prison hospital on October 21, 2015. He was then he was transferred to Albemarle C.I. on October 26, 2015. He was placed in the general prison population at Albemarle C.I. based on his "acuity level" change from level 4 to 2 even though he was still supposed to be in an infirmary; Defendant Mundle told Plaintiff there was nothing that could be done about it. (Doc. No. 1 at 30).

Plaintiff's allegations are insufficient to state a claim for retaliatory transfer because he fails to allege that the moving force behind the closure of Alexander C.I.'s infirmary or any of the subsequent transfers, was an actual desire to retaliate.[2] Therefore, Plaintiff's retaliatory transfer

---

[2] Plaintiff's allegations that the various transfers caused him pain are too vague and conclusory to state a claim upon which relief can be granted.

claims will be dismissed.

**(6)**     <u>**Grievances**</u>

"[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state." <u>Adams v. Rice</u>, 40 F.3d 72, 75 (4th Cir. 1994).

The Complaint attaches and refers to several grievances and grievance appeals that addressed some of the incidents set forth in the Complaint. However, to the extent that Plaintiff intended to make a claim for the denial of his grievances and grievance appeals, this fails to state a claim for § 1983 relief. Therefore, to the extent Plaintiff intended to assert such claims, they are dismissed.

**(7)**     <u>**Prison Policy**</u>

Plaintiff alleges that various actions and inactions by Defendants violated prison policy. However, "prison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of constitutional violation." <u>Jackson v. Sampson</u>, 536 Fed. Appx. 356, 357 (4th Cir. 2013) (unpublished). As such, Plaintiff's allegations that various policy violations occurred, without more, are insufficient to state a claim and are dismissed.

**(8)**     <u>**Failure to Train and Supervise**</u>

A state official can be in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a more limited way, his supervisory capacity. <u>King v. Rubenstein</u>, 825 F.3d 206, 223–24 (4th Cir. 2016). For personal liability, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). In an official-capacity suit, however, "[m]ore is required:" the suit is "treated as a suit

against the entity," which must then be a "'moving force' behind the deprivation," id. (quoting Polk County v. Dodson, 454 U.S. 312, 326 (1981)); thus, the entity's "'policy or custom' must have played a part in the violation of federal law," id. (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)). Meanwhile, a supervisor can be liable where (1) he knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between his inaction and the constitutional injury." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

Plaintiff generally alleges that Defendants Smith, Diggs, Beard, and McNally were deliberately indifferent in training, supervision and management of subordinate staff in an area critical to ensuring inmate safety and medical needs, and knowingly consented to unconstitutional behavior of another officer and subordinate. These claims are too vague and conclusory to proceed and will be dismissed.

Plaintiff alleges that he sent a letter to Defendants Clelland, Glick, and Parsons on December 9, 2015, stating that he was not being kept in the infirmary and that he was having ongoing problems with medical. Defendant Clelland responded on December 11, stating that he could not address why Plaintiff was transferred back to the facility. (Doc. No. 1 at 38-39). Defendant Glick did not, apparently, respond. Defendant Parsons allegedly told another prison employee that "Earl Watson will not go to segregation" even though Parsons knew Plaintiff was supposed to be in the infirmary pursuant to doctor's orders. (Doc. No. 1 at 33). Plaintiff has minimally stated a claim against Defendants Clelland, Glick, and Parsons which will be permitted to proceed.

Plaintiff alleges that he informed Geissele that he had been taken out of the infirmary weeks too early and that his pain level was 8 out of 10, and that he had not been given oxycodone while at ACI. Geissele ordered 30 more days of walker use and 30 days of oxycodone. Plaintiff fails to explain how Defendant Geissele's actions were deliberately indifferent or how he, as an outside orthopedic surgeon, tacitly authorized any unconstitutional behavior of a subordinate or of anything that occurred in prison. Therefore, the claims against Defendant Geissele will be dismissed.

Plaintiff's supervisory claims will therefore proceed against Defendants **Clelland, Glick, and Parsons** and will be dismissed with regards to the remaining Defendants.

(9)  **Conspiracy**

To establish a civil conspiracy under § 1983, a plaintiff must present evidence that the defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [plaintiff's] deprivation of a constitutional right." Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996); see Hafner v. Brown, 983 F.2d 570, 577 (4th Cir. 1992). An essential element in any conspiracy to deprive the plaintiff of his constitutional rights is an agreement to do so among the alleged co-conspirators. Ballinger v. North Carolina Ag. Extension Serv., 815 F.2d 1001 (4th Cir. 1987). Without such a meeting of the minds, the independent acts of two or more wrongdoers does not amount to a conspiracy. Murdaugh Volkswagen v. First Nat'l Bank, 639 F.2d 1073 (4th Cir. 1981). Where the complaint makes only conclusory allegations of a conspiracy under § 1983 and fails to demonstrate any agreement or meeting of the minds among the defendants, the court may properly dismiss the complaint. See Woodrum v. Woodward County Okl., 866 F.2d 1121 (9th Cir. 1989); Cole v. Gray, 638 F.2d 804 (5th Cir. 1981).

Construing the Complaint, liberally, Plaintiff appears to allege that Defendants Brewton, Bowden, Foreman, and Braithwaite's inadequate and incorrect PREA investigation "amounted to a civil conspiracy to conceal evidence of Plaintiff's injuries." (Doc. No. 1 at 25).

Although Plaintiff alleges that several Defendants purposefully made inaccurate records and PREA findings, he fails to allege that these Defendants had an agreement or reached a meeting of the minds. His conclusory allegations are insufficient to state a conspiracy claim and, accordingly, Plaintiff's conspiracy claim will be dismissed. See generally Woodrum, 866 F.2d at 1121; Cole, 638 F.2d at 804.

**(10)    North Carolina Claims**

The district courts have supplemental jurisdiction over claims that are so related to the claims over which the court has original jurisdiction that they "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A court may decline to exercise supplemental jurisdiction if: (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c)(1)-(4).

Plaintiff appears to allege that Defendants McFarland and Rinaldo assaulted him under North Carolina law. Because Plaintiff's excessive force claim against **McFarland** and **Rinaldo** has passed initial review, the Court will exercise supplemental jurisdiction over his related North Carolina assault claim.

### V.    CONCLUSION

For the reasons stated herein, the Complaint has passed initial review and will be permitted to proceed on Plaintiff's claims of: excessive force/failure to intervene against Defendants McFarland, Rinaldo, and Nurse Jane Doe 2; medical deliberate indifference against Defendants Kalinski, Polanco, Brathwaite, Foreman, Brewton, Randle, Bowden, Mundle, Quinn, Chung, and Ford; supervisory liability against Defendants Clelland, Glick, and Parsons; and North Carolina claims against McFarland and Rinaldo. Plaintiff's Motion to Appoint Counsel is denied.

**IT IS, THEREFORE, ORDERED** that:

1. The Complaint will proceed against Defendants McFarland, Rinaldo, and Nurse Jane Doe 2 for excessive force/failure to intervene; Defendants Kalinski, Polanco, Brathwaite, Foreman, Brewton, Randle, Bowden, Mundle, Quinn, Chung, and Ford for medical deliberate indifference; against Defendants Clelland, Glick, and Parsons for supervisory liability; and against McFarland and Rinaldo on claims under North Carolina law.

2. Plaintiff's Motion to Appoint Counsel, (Doc. No. 3), is **DENIED.**

3. **IT IS FURTHER ORDERED THAT** the Clerk of Court is directed to mail summons forms to Plaintiff for Plaintiff to fill out and return for service of process on Defendants **McFarland** and **Rinaldo.** Once the Court receives the summons forms, the Clerk shall then direct the U.S. Marshal to effectuate service on Defendants. The Clerk is respectfully instructed to note on the docket when the forms have been mailed to Plaintiff.

4. **IT IS FURTHER ORDERED THAT** the Clerk of Court shall commence the procedure for waiver of service as set forth in Local Rule 4.3 for Defendants **Bowden, Brathwaite, Brewton, Chung, Clelland, Ford, Foreman, Glick, Kalinski, Mundle,**

**Parsons, Polanco, Quinn, Randle,** and **Nurse Jane Doe 2,** and who are current or former employees of NC DPS.

Signed: November 27, 2018

Frank D. Whitney
Chief United States District Judge