UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
5:18-cv-142-FDW

| | | |
|---|---|---|
| EARL JAMES WATSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| PAULA SMITH, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**THIS MATTER** is before the Court on initial review of Plaintiff's Amended Complaint, (Doc. No. 74). He is proceeding *in forma pauperis*, (Doc. No. 6).

I.    **BACKGROUND**

*Pro se* Plaintiff has filed a civil rights suit pursuant to 42 U.S.C. § 1983 while incarcerated at the Albemarle Correctional Institution. The Complaint addresses events that allegedly occurred at the Catawba Valley Medical Center ("CVMC"), Alexander C.I., Central Prison, and Albemarle C.I.

Plaintiff names as Defendants the following employees of CVMC and/or Carolina Orthopedic Specialists:[1] CVMC Director **Eddie Beard**; Carolina Orthopedic Specialists Director **Sean McNally**; Carolina Orthopedic Specialists Surgeon **Alfred E. Geissele**; Carolina Orthopedic Specialists Nurse Practitioner **Steve McFarland**; CVMC Anesthesiologist **Frank E. Rinaldo, Jr.**; and CVMC **Nurses Jane Doe 1** and **2**.

Plaintiff names as Defendants the following employees of Albemarle C.I.: Nurse **Tanya**

---

[1] Also known as "Emerge."

1

**Bamburger**; Unit Manager **FNU Bowden**; Nurse Practitioner **Stephanie Brathwaite;** Lieutenant **FNU Brewton**; First Shift Lead Nurse **Donna Byrd;** Administrator **Jack Clelland**; Assistant Superintendent of Custody/Operations **Kenneth Diggs**; Nurse **April Foreman;** Correctional Officer **FNU Frick**; Assistant Superintendent of Programs **William Glick**; Nurse **FNU Goines**; Second Shift Lead Nurse **Sheana Litaker**; Nurse **FNU Maine**; Correctional Officer **Rhonda Morton**; Nurse **FNU Mundle**; Sergeant **FNU Murphy**; Nurse **FNU Ojeda**; Assistant Superintendent of Custody/Operations **Lawrence Parsons**; Medical Doctor **Leonard F. Polanco**; Lieutenant **FNU Randle**; Nurse **FNU Robertson**.

Plaintiff names the following employees of Alexander C.I. as Defendants: Medical Doctor **FNU Chung**; Physical Therapist **FNU Ford**; Medical Doctor **Marta M. Kalinski**; Medical Doctor **FNU Quinn**; **Correctional Officer John Doe**; and **Correctional Officer Jane Doe**.

Plaintiff also names as Defendant the Director of Medical Services for North Carolina Department of Public Safety ("NCDPS") **Paula Smith**.

The allegations in the Amended Complaint are largely duplicative of the original Complaint. Construing the Amended Complaint liberally and accepting the allegations as true, Defendants Frick and Morton transported Plaintiff to CVMC for scheduled back surgery on September 23, 2015. Plaintiff's surgery was delayed until the end of the day and Plaintiff told Frick and Morton that he felt like he was on death row waiting to go to his execution. Plaintiff was given medication then was taken back for his surgery while Frick and Morton were led away. Plaintiff was taken to what appeared to be a laundry room where Defendants McFarland and Rinaldo beat him in the presence of at least one nurse while Plaintiff, who was medicated, was unable to defend himself. During the beating, McFarland said "I don't know what you've got going on with that tattoo, if it's a memorial to the women you raped or what but I'm getting ready to fix

2

you where we don't ever have to worry about that ever again, and the incision is not going to be as small as I said it would be." (Doc. No. 74 at 11). Plaintiff regained consciousness after surgery when he was wheeled to a hospital room. Defendants Frick and Morton had already left the hospital.

Defendant Geissele discharged Plaintiff from CVMC on September 25, 2015, with medical restrictions on lifting, bending, and twisting, and orders that Plaintiff be housed in an infirmary rather than the general population and that he return for a follow-up in two weeks. Two Alexander C.I. officers put Plaintiff in handcuffs, waist chain, and leg shackles and pulled him into the back seat of a car to transport him to Alexander C.I., which violated doctor's orders and caused him excruciating pain.

When Plaintiff arrived at Alexander C.I., Plaintiff told Defendants Kalinski and Quinn about his injuries and pain, including loss of rectal and bladder control. Kalinski felt the lump on Plaintiff's chin and offered him diapers.

On September 29, 2015 in the Alexander C.I. infirmary, Plaintiff told Defendant Ford, a physical therapist and PREA contact, that he would like to talk to him. Ford came to see Plaintiff a few days later and Plaintiff told Ford about the September 23 assaults in detail, but Ford did not report them.

On October 2, 2015, the infirmary nurse at Alexander C.I. let Plaintiff's pain medication run out which left him to suffer excruciating pain until it was renewed after October 5, 2015.

On October 6, 2015, Plaintiff was transported to Emerge for his two-week checkup in a wheelchair. When he realized he would see McFarland he asked the transfer officers not to leave him alone with McFarland. Plaintiff showed McFarland the blue chain-like marks on his feet, the lump on his chin, and his pain and injuries. McFarland said that Plaintiff was not under his care

and he did not know what happened to Plaintiff. McFarland ordered the continuation of Plaintiff's pain medication and ordered six additional weeks in the infirmary (through November 17, 2015) and another follow-up in six weeks.

On October 9, 2015, Plaintiff's parents called Beard, Clelland, Geissele, Glick, McNally, Parsons, and Smith to try and get accurate information about what happened to Plaintiff and his condition. They were given the run-around and were hung up on.

On October 10, 2015, Plaintiff requested sick call to speak with someone in mental health about the September 23 assault.

Defendant Chung closed the infirmary at Alexander C.I. on October 13, 2015 and had Plaintiff transferred to Central Prison. Chung did not want to care for inmates in the infirmary any longer. The closure was done in retaliation for Plaintiff exercising his First Amendment right to inform Ford of the assaults, for requesting mental health care, and for his parents' phone calls.

Plaintiff was transferred from Alexander C.I. to Central Prison on October 13, 2015, by two Alexander C.I. officials in a van, which caused excruciating pain during the three-hour trip. Upon arriving at Central Prison's ER, none of the staff knew who Plaintiff was, where he had come from, or why he was sent there. He was placed in a 23-hour holding cell without phone access or visitation. A doctor eventually saw Plaintiff that night and cut his pain medication from 10 mg every four hours to 5 mg every six hours. On October 15, 2015, a doctor ordered that Plaintiff be kept out of general population for the next 21 days (12 days less than McFarland had ordered). Plaintiff's pain level was 9 out of 10 so the doctor raised the pain medication to 5 mg every four hours.

On October 21, 2015, Central Prison "officials" discharged Plaintiff from the hospital and

attempted to release him into general population. (Doc. No. 74 at 18). Plaintiff explained his need for infirmary housing and the use of the walker and he was allowed to remain in the 23-hour holding cell.

On October 26, 2015, Plaintiff was told to pack up because Plaintiff was going back where he came from on a bus and the walker could not go with him. However, instead of returning to Alexander C.I., Plaintiff was sent to Albemarle C.I. Upon arriving at Albemarle C.I., officers had to lift Plaintiff by his arms to get him off the bus which caused excruciating pain.

Plaintiff immediately informed Defendants Brewton, Mundle, and Murphy he was supposed to be out of the general population and in the infirmary per doctor's orders and that he was in a lot of pain. Mundle told him that his activity level had been changed from level 4 to level 2 and that nothing could be done about it. He was placed in the general population in a unit that does not have handicap facilities. Plaintiff put in a sick call request with regards to the improper change in his activity level.

Plaintiff went to the window for pain medication on October 26, 2015, and Nurse Goins said "you have done gobbled up thirty pills you don't have nothing to take." (Doc. No. 74 at 19). She refused to give him Tylenol or anything. Plaintiff was unable to sleep due to pain that night and on many subsequent nights.

On October 30, 2015, Plaintiff's mother phoned Nurse Litaker, who found the October 15 doctor's order to keep Plaintiff in the infirmary rather than general population. Litaker informed the officer in charge, Randle, who offered to place Plaintiff in segregation. Plaintiff explained that segregation is not the same as an infirmary and said that he wanted to go to the infirmary at

Salisbury or Alexander C.I. Randle said he could not do that and he had already spoken to Parsons about the situation, who said "Earl Waston will not go to segregation." (Doc. No. 74 at 20). The conversation with Randle kept Plaintiff from filing an emergency grievance because, according to Randle, Parsons already knew that Plaintiff was supposed to be in the infirmary per doctor's orders.

During a sick call on October 31, 2015, Plaintiff discovered that there was 625 mg of Tylenol in his self-medication bag that Kalinski had ordered for him on September 25, 2015. "Medical staff" did not give Plaintiff the Tylenol for his pain. (Doc. No. 74 at 20).

On November 2, 2015, the sick call list indicated that Plaintiff had an appointment, but the list then disappeared. When Plaintiff went to medical to ask about his appointment, Nurse Bamburger said there was no sick call for him, it must be lost, and he should put in another request.

On November 3, 2015, Plaintiff filed a grievance about being improperly discharged from the infirmary and being returned to general population against doctors' orders and appealed to the highest level.

On November 9, 2015, Plaintiff was seen by Defendant Polanco, whom Plaintiff told he was still supposed to be in the infirmary, that his rectal muscles were damaged, that he was having trouble holding his urine, and that he could not sleep because his pain was 9 out of 10. Polanco examined Plaintiff's back and saw the healed surgical scar and stated "all that don't matter, you're healed up." (Doc. No. 74 at 21). Polanco refused to look at the blue marks on Plaintiff's ankle and foot.

On November 10, 2015, Plaintiff wrote a letter to NC Prisoner Legal Services about filing a civil case regarding the deprivation of rights and medical needs, and his case was declined on December 1, 2015.

On November 18, 2015 Plaintiff submitted another grievance about the violation of his

rights after his back surgery, not being kept in the infirmary, and lack of pain medication.

On November 20, 2015, Plaintiff was taken to Emerge by Officers Frick and Catoe. Plaintiff asked the officers not to leave him alone. Plaintiff told Geissele and McFarland that he had been taken out of the infirmary weeks too early, that his pain level was 8 out of 10, and he was not being given oxycodone at Albemarle C.I. Geissele ordered 30 more days of walker use and oxycodone.

At Albemarle C.I., Plaintiff periodically reported to the pain medication window to see if the medication that Geissele ordered had arrived. He also put in a sick call request for the medication on November 27, 2015. He filed a grievance and appealed the response because he still had not received a narcotic pain medication. On November 29, 2015 a Step-One response was filed regarding the November 18 grievance saying that medical cannot give offenders a narcotic for self-medication and that his medication will continue at the medication window. He appealed, explaining that no medication was being provided at the window.

Plaintiff saw Nurse Ojeda on November 30, 2015, she said that no medical staff had checked his file since he had gone to Emerge on November 20 and scheduled him to see a provider the next day. However, that visit never happened.

On December 1, 2015, Plaintiff received a copy of the Unit Response to his November 18 grievance and asked Sergeant Mullins whether the response said that he had a narcotic at the pain medication window. Mullins said yes. Plaintiff asked Mullins to call medical to verify, which Mullins did. Bamburger told Mullins "Mr. Watson does not have a narcotic here and it has been since October that he has had any" at Central Prison. (Doc. No. 74 at 23).

Plaintiff went to the medication window on December 3 and 7 but Nurse Robertson told him on both occasions that there was no medication for him.

As of December 9, Plaintiff had not seen a provider or received his medication so he filled out another sick call request and wrote a letter to Defendants Clelland, Glick, and Parsons. On December 11, Clelland wrote a response saying he could not address why Plaintiff was transferred back to that facility. That same day, Nurse Byrd wrote a response saying that Dr. Polanco saw Plaintiff on November 3 and had ordered Tylenol and Meloxicam but that Plaintiff had requested that the Meloxicam be discontinued. Plaintiff refused the Meloxicam because he is allergic to NSAIDs.

On December 16, 2015, Plaintiff was told to go to medical. Nurse Maine began addressing his December 9 sick call regarding pain medication but she was unable to log into the computer. Nurse Barrier took over and found the doctors' orders about holding Plaintiff in the infirmary and providing oxycodone. Brathwaite then entered an order for oxycodone. Plaintiff showed Brathwaite his left foot and ankle and she said it looked badly bruised. When Plaintiff said that the marks match his shackles, she told him to leave. Nurse Maine asked Plaintiff to sign a refusal of the December 9 sick call but Plaintiff refused. Maine and Ojeda signed the refusal without Plaintiff's authorization.

Plaintiff finally received oxycodone on December 16.

On May 7, 2017, Plaintiff put in a request to see psychologist Guignard and gave her the grievance he had prepared about the September 23 assault. Guignard told Plaintiff to submit the grievance with the facility head, Defendant Glick. She diagnosed Plaintiff with PTSD.

A preliminary PREA investigation was conducted by Defendant Brewton as investigator with Defendant Bowden acting as Plaintiff's PREA support person. Foreman and Brathwaite conducted the medical examination. Plaintiff's sexual battery complaint should have been referred to law enforcement for a criminal investigation.

Defendants Brewton, Bowden, Foreman, Brathwaite, Clelland, Diggs, and Glick had a meeting of the minds to act in concert to deny Plaintiff medical treatment and falsified and destroyed medical records to conceal evidence of Plaintiff's injuries so that his claims could not be verified, which deprived him of a means to challenge conduct that violated the First, Fifth, Eighth, and Fourteenth Amendments.

When Defendants failed to provide Plaintiff with safety and treat his medical needs he suffered unnecessary and wanton physical and mental pain and a decline in his health. Plaintiff believes that his prostate was damaged in the September 23 attack which left him impotent, and that the catheter was placed too deeply and caused scarring. He has trouble holding his urine, feels like he has to urinate all the time, and had trouble emptying his bladder. Plaintiff has pain in his testicles from the assault. His rectal muscles were damaged and he has lost rectal control from the injuries he sustained in the attack. His feet, ankles, and lower legs have nerve damage and sharp pain. His has "drop foot" on his left side from overstretched ligaments and tendons. At times his left knee gives out while standing and walking. His lower has sharp pains and popping where the surgery was performed. Both of his hips have nerve damage and are numb. The left side of his chest has a possible pectoral tear and nerve damage. He has pain in the back of his neck between his shoulders. In addition to the physical pain and injuries, he has suffered mental and emotional anguish, distress, fright, fear, shock, nightmares, and humiliation.

Plaintiff seeks declaratory judgment, preliminary and permanent injunction, compensatory and punitive damages, a jury trial, costs and fees, and any additional relief the Court deems just and equitable.

## II.    LEGAL STANDARD

Because Plaintiff is a prisoner proceeding *in forma pauperis*, the Court must review the

Complaint to determine whether it is subject to dismissal on the grounds that it is "(i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). In its frivolity review, a court must determine whether the Complaint raises an indisputably meritless legal theory or is founded upon clearly baseless factual contentions, such as fantastic or delusional scenarios. Neitzke v. Williams, 490 U.S. 319, 327-28 (1989). A complaint should not be dismissed for failure to state a claim "unless 'after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.'" Veney v. Wyche, 293 F.3d 726, 730 (4th Cir. 2002) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999)).

A *pro se* complaint must be construed liberally. Haines v. Kerner, 404 U.S. 519, 520 (1972); see also Smith v. Smith, 589 F.3d 736, 738 (4th Cir. 2009) ("Liberal construction of the pleadings is particularly appropriate where … there is a pro se complaint raising civil rights issues."). However, the liberal construction requirement will not permit a district court to ignore a clear failure to allege facts in his complaint which set forth a claim that is cognizable under federal law. Weller v. Dep't of Soc. Servs., 901 F.2d 387 (4th Cir. 1990). A *pro se* complaint must still contain sufficient facts "to raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007); see Ashcroft v. Iqbal, 556 U.S. 662 (2009) (the Twombly plausibility standard applies to all federal civil complaints including those filed under § 1983). This "plausibility standard requires a plaintiff to demonstrate more than a sheer possibility that a defendant has acted unlawfully." Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (internal quotation marks omitted). He must

articulate facts that, when accepted as true, demonstrate he has stated a claim entitling him to relief. <u>Id.</u>

## IV.   DISCUSSION

**(1)   <u>Parties</u>**

### (A)   <u>Individuals Not Named as Defendants</u>

The Federal Rules of Civil Procedure provide that, "[i]n the complaint the title of the action shall include the names of all the parties." Fed. R. Civ. P. 10(a); <u>see</u> <u>Myles v. United States</u>, 416 F.3d 551 (7th Cir. 2005) ("to make someone a party the plaintiff must specify him in the caption and arrange for service of process."). Although pro se litigants are entitled to have their pleadings liberally construed, <u>Haines</u>, 404 U.S. at 520, "[d]istrict judges have no obligation to act as counsel or paralegal to pro se litigants," <u>Pliler v. Ford</u>, 542 U.S. 225 (2004).

The body of the Complaint contains allegations against individuals who are not named as defendants in the caption as required by Rule 10(a). This failure renders Plaintiff's allegations against them nullities. <u>See</u>, <u>e.g.</u>, <u>Londeree v. Crutchfield Corp.</u>, 68 F.Supp.2d 718 (W.D. Va. Sept. 29, 1999) (granting motion to dismiss for individuals who were not named as defendants in the compliant but who were served). The allegations directed at individuals not named as Defendants are therefore dismissed without prejudice.

### (B)   <u>Vague and Conclusory Claims</u>

Plaintiff makes a number of allegations that are not attributed to any of the named Defendants or which are too vague and conclusory to establish that a violation of Plaintiff's rights occurred. Such allegations have failed to state a claim upon which relief can be granted and therefore will be dismissed. <u>See</u> Fed. R. Civ. P. 8(a)(2) (short and plain statement is required); <u>Simpson v. Welch</u>, 900 F.2d 33, 35 (4th Cir. 1990) (conclusory allegations, unsupported by specific

allegations of material fact are not sufficient); <u>Dickson v. Microsoft Corp.</u>, 309 F.3d 193, 201-02 (4th Cir. 2002) (a pleader must allege facts, directly or indirectly, that support each element of the claim).

**(C)**     **John and Jane Doe**

John Doe suits are permissible only against "real, but unidentified, defendants." <u>Schiff v. Kennedy</u>, 691 F.2d 196, 197 (4th Cir. 1982). The designation of a John Doe defendant "is generally not favored in federal courts; it is appropriate only when the identity of the alleged defendant is not known at the time the complaint is filed and the plaintiff is likely to be able to identify the defendant after further discovery." <u>Njoku v. Unknown Special Unit Staff</u>, 217 F.3d 840, 840 (4th Cir. 2000). "[I]f it does not appear that the true identity of an unnamed party can be discovered through discovery or through intervention by the court, the court could dismiss the action without prejudice." <u>Schiff</u>, 691 F.2d at 197-98 (because it appeared that John Doe was an actual person, it was error for the district court to conclude that, under appropriate circumstances, this type of case would not be permitted).

Plaintiff has named as Defendants John Doe and Jane Doe correctional officers. Plaintiff refers to several unnamed officers in the Amended Complaint but fails to explain which of these officers, if any, are the intended John and Jane Doe Defendants. These claims are therefore too uncertain to screen on initial review. Therefore, the claims against John and Jane Doe correctional officers will be dismissed.

**(D)**     **Private Parties**

To state a claim under § 1983, a plaintiff must allege that she was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." <u>Am. Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 49-50

(1999). The color of law requirement "excludes from its reach merely private conduct, no matter how discriminatory or wrongful." <u>Id.</u> at 50 (internal quotations omitted). The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." <u>West v. Atkins</u>, 487 U.S. 42, 49 (1988) (quoting <u>United States v. Classic</u>, 313 U.S. 299, 326 (1941)). The "under-color-of-state-law element of § 1983 excludes from its reach 'merely private conduct, no matter how discriminatory or wrongful.'" <u>American Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 50 (1999) (quoting <u>Blum v. Yaretsky</u>, 457 U.S. 991, 1002 (1982) (treating § 1983's "color of law" requirement as the equivalent to the "state action" requirement under the 14th Amendment)).

Determining whether a private party's action is fairly attributable to the state requires the court to begin by identifying the specific conduct of which the plaintiff complains. <u>American Mfrs</u>, 526 U.S. at 50. This inquiry is "fact-bound." <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 939 (1982). Circumstances under which the Supreme Court has held that a private party may be deemed a state actor for purposes of § 1983 liability are: "(1) when the state has coerced the private actor to commit an act that would be unconstitutional if done by the state; (2) when the state has sought to evade a clear constitutional duty through delegation to a private actor; (3) when the state has delegated a traditionally and exclusively public function to a private actor; or (4) when the state has committed an unconstitutional act in the course of enforcing a right of a private citizen." <u>Andrews v. Fed'l Home Loan Bank</u>, 998 F.2d 214, 217 (4th Cir. 1993); <u>see also</u> <u>Goldstein v. Chestnut Ridge Vol. Fire Co.</u>, 218 F.3d 337, 342 (4th Cir. 2000); <u>Haavistola v. Community Fire Co.</u>, 6 F.3d 211, 215 (4th Cir. 1993). As a general matter, physician authorized by the state to provide medical care to a prisoner exercises power that is traditionally the exclusive prerogative

of the state, regardless of the physician's employment relationship with the state. <u>Conner v. Donnelly</u>, 42 F.3d 220 (4th Cir. 1994); <u>see</u> <u>also</u> <u>West v. Atkins</u>, 487 U.S. 42 (1988) (physician who was under contract with state to provide medical services to inmates at state prison hospital on part-time basis acted under the color of state law when he treated inmate).

Plaintiff alleges that the Emerge and CVMC/Emerge Defendants were "under contract with NCDPS to provide medical care and services to inmates confined with NCDPS, including Plaintiff." (Doc. No. 74 at 6). The specific conduct of which Plaintiff complains is the alleged beating and failure to protect by those private medical providers. While the CVMC/Emerge Defendants were providing medical services to NCDPS and Plaintiff, there is no suggestion in the record that they were charged with overseeing Plaintiff's security. Therefore, they were not acting under the color of state law when they allegedly assaulted him. <u>See</u>, <u>e.g.</u>, <u>Mentavlos v. Anderson</u>, 249 F.3d 301 (4th Cir. 2001) (Citadel cadet's decision to engage in unauthorized harassment of another student was not state action under § 1983; even though the school had delegated to the cadet some limited authority to act, the state did not coerce, compel, or encourage the harassment by any law, regulation, or custom and thus the cadet's actions could not be fairly attributed to the state under § 1983). To the extent that Plaintiff attempts to state excessive force and state law assault and battery claims against Plaintiff, these claims are dismissed because the private medical Defendants were not acting under the color of state law when they committed those alleged acts.

Plaintiff attempts to recast his excessive force and assault claims as claims of deliberate indifference to a serious medical need and supervisory liability. Assuming that Plaintiff's back condition is a serious medical need, there is no allegation that the CVMC/Emerge Defendants were deliberately indifferent to that need. Instead, they provided Plaintiff with surgery and follow-up care that Plaintiff does not suggest was anything other than adequate and appropriate. The only

14

possible exception is McFarland's statement that Plaintiff's surgical scar would not be as small as promised. However, Plaintiff fails to explain how McFarland, a nurse, had any control over the size of Plaintiff's surgical scar and Plaintiff does not allege that his threat about a larger-than-promised scar came to pass. Plaintiff's allegations thus fall short of demonstrating deliberate indifference to a serious medical need.

For the foregoing reasons, the claims against the private medical Defendants employed by CVMC/Emerge – Defendants McFarland, Rinaldo, Geissele, McNally, Beard, Nurse Jane Doe 1, and Nurse Jane Doe 2 – will be dismissed.

**(3)      Cruel & Unusual Punishment**

The Eighth Amendment prohibits punishments that "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103 (1976) (quoting Gregg v. Georgia, 428 U.S. 153, 173 (1976)). "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment," Helling v. McKinney, 509 U.S. 25, 31 (1993). Knowing of, but disregarding, an excessive risk to an inmate's health or safety is referred to as deliberate indifference. Farmer v. Brennan, 511 U.S. 825, 837 (1994) (internal quotations omitted). A prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation alleged must be, objectively, "sufficiently serious," Wilson v. Seiter, 501 U.S. 294, 298 (1991); see also Hudson v. McMillian, 503 U.S. 1, 5 (1992), and must result in the denial of "the minimal civilized measure of life's necessities," Rhodes v. Chapman, 452 U.S. 337, 347 (1981). The second requirement is that a prison official must have a "sufficiently culpable state of mind." Wilson, 501 U.S. at 297, 302-03; Hudson, 503 U.S. at 5, 8.

**(A)      Excessive Force/Failure to Protect**

"[T]he use of excessive physical force against a prisoner may constitute cruel and unusual punishment [even] when the inmate does not suffer serious injury." <u>Hudson</u>, 503 U.S. 1, 4 (1992); <u>see</u> <u>Wilkins v. Gaddy</u>, 559 U.S. 34, 34 (2010). The "core judicial inquiry," is not whether a certain quantum of injury was sustained, but rather "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." <u>Hudson</u>, 503 U.S. at 7. "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated ... whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury." <u>Hudson</u>, 503 U.S. at 9, 13–14.

The Fourth Circuit addresses a failure to intervene claim as a theory of "bystander liability" wherein there is "an omission to act...coupled with a duty to act." <u>Randall v. Prince George's Cnty.</u>, 302 F.3d 188, 202 (4th Cir. 2002). A "bystander officer" could be liable for his or her nonfeasance if he or she: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." <u>Id.</u> at 204. However, if no excessive force is applied by the fellow officer, the officer witnessing the conduct "cannot be held liable under bystander liability for a failure to intervene." <u>Howie v. Prince George's Cnty.</u>, 2009 WL 2426018 at *6 (D. Md. Aug. 5, 2009); <u>see also</u> <u>Jarvis v. Securitas Sec. Servs. USA</u>, 2012 WL 527597 (D. Md. Feb. 16, 2012).

To obtain relief under § 1983 on a claim of failure to protect, an inmate must show: (1) "serious or significant physical or emotional injury" resulting from that failure; and (2) the prison officials had a "sufficiently culpable state of mind," which in this context is deliberate indifference.

<u>Farmer</u>, 511 U.S. at 834. A prison official is "deliberately indifferent to a substantial risk of harm to a [prisoner] when that [official] 'knows and disregards' the risk." <u>Parrish ex rel. Lee v. Cleveland</u>, 372 F.3d 294, 302 (4th Cir. 2004) (quoting <u>Farmer</u>, 511 U.S. at 837). "It is not enough to prove that the official should have known of the risk; instead, 'the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he should draw the inference.'" <u>Kartman v. Markle</u>, 582 Fed. Appx. 151, 153 (2014) (quoting <u>Farmer</u>, 511 U.S. at 837). A showing of negligence does not rise to the level of deliberate indifference. <u>Davidson v. Cannon</u>, 474 U.S. 344, 347-48 (1986).

A prison official's subjective actual knowledge can be proven through circumstantial evidence, for example, that the "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." <u>Farmer</u>, 511 U.S. at 842. Direct evidence of actual knowledge is not required. <u>Id.</u> A prison official cannot escape liability for deliberate indifference by showing that, "while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." <u>Farmer</u>, 511 U.S. at 843. The question is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future health… and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." <u>Id.</u> However, because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware of an obvious risk to

inmate health or safety. For example, they may show "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Farmer, 511 U.S. at 844. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, "even if the harm was not averted" because a prison official's duty is to ensure "reasonable safety." Id. (quoting Helling v. McKinney, 509 U.S. 24, 33 (1993)). This standard "incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" Id. (quoting Spain v. Procunier, 600 F.2d 189, 193 (9th Cir. 1979) (Kennedy, J.). Absent successful rebuttal, prison officials may be held liable for obvious risks they must have known. Makdessi v. Fields, 789 F.3d 126, 133 (4th Cir. 2015) (citing Farmer, 511 U.S. at 842).

Plaintiff alleges that Defendants Frick and Morton failed to adequately supervise him, provide for his safety, use reasonable care in protecting him from assault. According to Plaintiff, these Defendants were responsible for transporting him from Albemarle C.I. to CVMC for surgery. They did so, then waited with him until it was time for his surgery. They walked down the hallway with the gurney then followed a nurse while Plaintiff was handed off for surgery to Nurse Practitioner McFarland and Anesthesiologist Rinaldo. Plaintiff alleges that Frick and Morton failed to act on this knowledge of a substantial risk of serious harm and, as a result, failed to protect him from the assault at the hands of McFarland and Rinaldo.

Plaintiff has failed to state a plausible deliberate indifference claim against Defendants Frick and Morton. Plaintiff fails to explain how these Defendants could have known that members

of his medical team were going to assault him. Plaintiff's statement in the waiting room that he felt like he was on death row reasonably conveyed Plaintiff's fear of surgery, not fear of assault. He fails to explain how either Defendant knew that Plaintiff risked assault by his medical team, indeed, Plaintiff's allegations suggest that the assault was a surprise to him. He has failed to allege that Frick and Morton knew of any risk of assault to Plaintiff by the medical team and he does not allege that they were not actually present when any assaultive behavior occurred. Therefore, Plaintiff has failed to state a claim against Defendants Frick and Morton and the claims against them will be dismissed.

**(B)**    **Medical Deliberate Indifference**

Deliberate indifference to serious medical needs of prisoners "constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." Estelle, 429 U.S. at 104 (citation and internal quotation marks omitted). The deliberate indifference standard has two components. The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry. See Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Id. at 241 (internal quotation marks omitted). An actionable deliberate indifference claim does not require proof that the plaintiff suffered an actual injury. Instead, it is enough that the defendant's actions exposed the plaintiff to a "substantial risk of serious harm." Farmer, 511 U.S. at 837; see also Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997) (deliberate-indifference standard requires prisoner to "produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions, or demonstrate a substantial risk of such serious harm resulting from the

prisoner's unwilling exposure to the challenged conditions" (citation omitted)). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (citing Gittlemacker v. Prasse, 428 F.2d 1, 6 (3d Cir. 1970)). A mere delay or interference with treatment can be sufficient to constitute a violation of the Eighth Amendment. Smith v. Smith, 589 F.3d 736, 739 (4th Cir. 2009). In such cases, in addition to establishing that his medical need was objectively serious, a plaintiff also must show that the delay in providing medical care caused him to suffer "substantial harm." Webb v. Hamidullah, 281 Fed. Appx. 159, 166 (4th Cir. 2008).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable § 1983 claim. Estelle, 429 U.S. at 106. To be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety." Farmer, 511 U.S. at 837; Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976).

The Complaint passed initial review on claims of deliberate indifference to a serious medical need against Defendants **Bowden, Brathwaite, Brewton, Chung, Ford, Foreman, Kalinski, Mundle, Polanco, Quinn,** and **Randle.**[2] Plaintiff's claims against these Defendants are substantially the same as those in the original Complaint and are sufficient to proceed. In addition, Plaintiff alleged that Defendant **Murphy** was deliberately indifferent for failing to act when

---

[2] The Order on initial review has some contradictory language addressing Defendant Foreman, however, the Court concluded that the deliberate indifference claim against her was sufficient to proceed.

Plaintiff informed him upon arriving at Albemarle C.I. that doctor's orders require housing in the infirmary and that his activity level was improperly changed. These claims are sufficient to proceed.

The Amended Complaint adds deliberate indifference claims against Albemarle C.I. Nurses Tanya Bamburger, Donna Byrd, FNU Goines, Sheana Litaker, FNU Maine, FNU Ojeda, and FNU Robertson. He alleges that Byrd wrote a grievance response saying that he had seen Dr. Polanco and was prescribed Tylenol and meloxicam, and that he had refused the meloxicam. This single contact is insufficient to demonstrate deliberate indifference. He alleges that Defendant Litaker found doctor notes in Plaintiff's file for infirmary housing on October 15, during a phone call with Plaintiff's mother. Litaker informed the officer in charge of the order and Randle came to see Plaintiff as a result. Litaker's discovery of an error and informing the officer in charge of that error fails to show deliberate indifference. Plaintiff alleges that Defendant Bamburger turned him away on November 2 because there was no sick call from Plaintiff and that he should put in another request, and that Bamburger told Mullins on November 18 that there was no narcotic in medical for Plaintiff. These two brief contacts with Plaintiff's care fail to adequately allege that Bamburger knew of, and deliberately disregarded, any serious medical need of Plaintiff's. Plaintiff alleges that Nurse Goines told Plaintiff on October 26 that he did not have any pain medication left and refused to provide him with anything for his pain, including Tylenol. This allegation is minimally sufficient to proceed. Plaintiff alleges that he went to the medication window on December 3 and 7 to see if his pain medication had arrived and Nurse Robertson told him, on both occasions, that it had not. Informing Plaintiff about the status of his prescription does not rise to the level of deliberate indifference. Plaintiff alleges that he saw Nurse Ojeda on November 30 and

she informed him that no medical staff had reviewed his file since his follow-up at Emerge and scheduled him to see a provider the next day, which never happened. He also alleges that Nurses Maine and that Ojeda signed a refusal on Plaintiff's behalf on December 9, against Plaintiff's wishes. It is unclear at this early stage whether Plaintiff's allegation about Defendant Ojeda's and Maine's signatures on the refusal form constituted deliberate indifference to a serious medical need so this claim will be allowed to proceed at this time.

Therefore, Plaintiff's deliberate indifference claims are sufficient to proceed against Defendants **Bowden, Brathwaite, Brewton, Chung, Ford, Foreman, Goines Kalinski, Maines, Mundle, Murphy, Ojeda, Polanco, Quinn,** and **Randle.**

    (4)    <u>**PREA**</u>

The Prison Rape Elimination Act, ("PREA"), 42 U.S.C. §§ 3031, et seq., seeks to establish "zero-tolerance" for the incidence of prison rape. 42 U.S.C. § 30302(1). "[S]ection 1983 itself creates no rights; rather it provides a method for vindicating federal rights elsewhere conferred." <u>Doe v. Broderick</u>, 225 F.3d 440, 447 (4th Cir. 2000) (internal citations omitted). "[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." <u>Gonzaga Univ. v. Doe</u>, 536 U.S. 273, 286 (2002). Nothing in the PREA suggests that Congress intended to create a private right of action for inmates to sue prison officials for noncompliance with the PREA. <u>See</u> <u>De'Lonta v. Clarke</u>, 2012 WL 4458648 at *3 (W.D. Va. Sept. 11, 2012) ("Nothing in the PREA suggests that Congress intended to create a private right of action for inmates to sue prison officials for noncompliance with the Act."), aff'd <u>De'Lonta v. Pruitt</u>, 548 Fed. Appx. 938 (4th Cir. 2013); <u>see</u> <u>also</u> <u>Chapman v. Willis</u>, 2013 WL 2322947 at *4 (W.D. Va.

May 28, 2013). Nor does a prisoner have a constitutional right to a PREA investigation. <u>See generally</u> <u>DeShaney v. Winnebago County Dep't of Soc. Servs.</u>, 489 U.S. 189, 196 (1989) ("The Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.")); <u>see</u>, <u>e.g.</u>, <u>Wise v. Wilson</u>, 2017 WL 71656 (E.D. Va. Jan 6, 2017) (prisoner has no constitutional right to have a PREA complaint investigated).

Plaintiff appears to allege that Defendants Brewton, Bowden, Foreman, and Braithwaite conducted an inadequate PREA investigation which violated the PREA and resulted in an inaccurate PREA report. He claims that Defendants purposefully misrepresented medical records and failed to accurately document Plaintiff's injuries during the PREA investigation for the purpose of concealing Plaintiff's injuries. Plaintiff alleges that Lieutenant Brewton conducted a preliminary PREA investigation at Albemarle C.I. after Plaintiff told a psychologist about the September 23, 2015, assaults. Plaintiff alleges that his allegations were met with derision and disbelief, medical records were falsified and manipulated, photographs were not taken, the investigation failed to include an effort to determine whether Frick and Morton's actions contributed to the assaults, Plaintiff wrote a grievance about the PREA examination and investigation.

There is no private cause of action for a PREA violation and a prisoner has no constitutional right to a PREA investigation. Therefore, this claim will be dismissed as frivolous for the same reasons it was dismissed in the Order on initial review of the Complaint.

**(5)**     **<u>Retaliatory Transfer</u>**

Plaintiff does not have a federally protected liberty interest in any particular housing or classification unless it exceeds the scope of his original sentence and imposes an atypical and significant hardship in relation to the ordinary incidents of prison life. See Sandin v. Conner, 515 U.S. 472 (1995). "[C]hanges in a prisoner's location, variations of daily routine, changes in conditions of confinement (including administrative segregation) and the denial of privileges … are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage prisons safely and efficiently." Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991) (en banc).

However, prison officials may not retaliate against an inmate for exercising a constitutional right. See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir. 1978). To succeed on such a claim, a plaintiff must first allege that "the retaliatory act was taken in response to the exercise of a constitutionally protected right...." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). Thereafter, a plaintiff must demonstrate that he suffered some adverse impact or actual injury. See Am. Civ. Libs. Un. of Md., Inc. v. Wicomico Cnty., 999 F.2d 780, 785 (4th Cir. 1993) (citing Huang v. Board of Governors of Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990)). In addition, a plaintiff must come forward with specific evidence "establish[ing] that but for the retaliatory motive the complained of incident[s] ... would not have occurred." Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995); accord Ponchik v. Bogan, 929 F.2d 419, 420 (8th Cir.1991) (plaintiff must show that action would not have occurred "but for" the alleged reprisal); Collinson v. Gott, 895 F.2d 994, 1002 (4th Cir. 1990) (Phillips, J., concurring); McDonald v. Hall, 610 F.2d 16, 18–19 (1st Cir.1979). In the prison context, such claims are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." Adams, 40 F.3d at 74.

As a general matter, a criminal defendant has no basis for complaint when he is transferred from one institution to another; the fact that life in one prison might be more disagreeable than in another is alone insufficient to warrant due process protections. <u>Meachum v. Fano</u>, 427 U.S. 215 (1976); <u>see</u> <u>Montanye v. Haymes</u>, 427 U.S. 236 (1976) (the due process clause does not require hearings in connection with transfers, whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive). However, transfers may be judicially challenged when they are retaliatory or are used as a means of punishing the exercise of constitutional freedoms. <u>See</u> <u>Montanye</u>, 427 U.S. at 242. To successfully argue retaliatory transfer in violation of his constitutional rights pursuant to § 1983, a plaintiff "must prove that a desire to retaliate was the actual motivating factor behind the transfer." <u>Goff v. Burton</u>, 91 F.3d 1188, 1191 (8th Cir.1996). In other words, the plaintiff must prove that but for his protected First Amendment activity, he would not have been transferred. <u>Rouse v. Benson</u>, 193 F.3d 936, 940 (8th Cir. 1999).

Plaintiff alleges that Defendant Chung closed the infirmary at Alexander C.I. on October 13, 2015, after Plaintiff's parents made phone calls about his treatment and condition, Plaintiff told Defendant Ford about the physical and sexual assaults, and Plaintiff asked to speak with someone in mental health about the assaults. Plaintiff's allegations are insufficient to state a claim for retaliatory transfer for the same reasons this claim was dismissed in the Order on initial review of the Complaint.

**(6)**     <u>**Grievances**</u>

"[T]he Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state." <u>Adams</u>, 40 F.3d at 75.

The Complaint attaches and refers to several grievances and grievance appeals that

addressed some of the incidents set forth in the Complaint. However, to the extent that Plaintiff intended to make a claim for the denial of his grievances and grievance appeals, this fails to state a claim for § 1983 relief. Therefore, to the extent Plaintiff intended to assert such claims, they are dismissed for the same reason this claim was dismissed in the Order on initial review of the Complaint.

**(7)**     <u>**Prison Policy**</u>

Plaintiff alleges that various actions and inactions by Defendants violated prison policy. However, "prison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of constitutional violation." <u>Jackson v. Sampson</u>, 536 Fed. Appx. 356, 357 (4th Cir. 2013) (unpublished). As such, Plaintiff's allegations that various policy violations occurred, without more, are insufficient to state a claim and are dismissed for the same reasons as set forth in the Order on initial review of the Complaint.

**(8)**     <u>**Failure to Train and Supervise**</u>

A state official can be in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a more limited way, his supervisory capacity. <u>King v. Rubenstein</u>, 825 F.3d 206, 223–24 (4th Cir. 2016). For personal liability, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). In an official-capacity suit, however, "[m]ore is required:" the suit is "treated as a suit against the entity," which must then be a "'moving force' behind the deprivation," <u>id.</u> (quoting <u>Polk County v. Dodson</u>, 454 U.S. 312, 326 (1981)); thus, the entity's "'policy or custom' must have played a part in the violation of federal law," <u>id.</u> (quoting <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 694 (1978)). Meanwhile, a supervisor can be liable where (1) he knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk

of constitutional injury;" (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between his inaction and the constitutional injury." <u>Shaw v. Stroud</u>, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

Plaintiff's claims based on supervisory liability passed initial review as to Defendants **Clelland, Glick** and **Parsons** and they are likewise sufficiently alleged in the Amended Complaint. Plaintiff further alleges in the Amended Complaint that his parents made phone calls to individuals including Defendant Smith in an attempt to obtain information about what happened to him and his condition, but they were given the run-around. This single phone call about Plaintiff's case fails to demonstrate adequate personal involvement by Smith and is too vague and conclusory to establish supervisory liability. Plaintiff additionally argues with regards to Defendants Diggs and Murphy that there is a longstanding pattern of deliberately ignoring, denying, and delaying Plaintiff's medical treatment. As to Defendant Diggs, Plaintiff further alleges that he failed to adequately manage and investigate staff's conduct, and was deliberately indifferent in screening, supervising, training, and managing subordinate staff in areas critical to ensuring safety and medical needs, and failed to act after being placed on notice of the acts and omissions of Defendants McFarland, Rinaldo, Nurses Jane Doe 1 and 2, Frick, and Morton. The claims against Diggs and Murphy are to vague and conclusory to support supervisory liability claims. Moreover, there can be no supervisory liability based on the acts of Frick, Morton, and the CMVC/Emerge Defendants because the allegations about the underlying acts fail to state a § 1983 claim.

Plaintiff's supervisory claims will therefore proceed against Defendants **Clelland, Glick,** and **Parsons** and will be dismissed with regards to the remaining Defendants.

(9) <u>**Conspiracy**</u>

To establish a civil conspiracy under § 1983, a plaintiff must present evidence that the defendants "acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [plaintiff's] deprivation of a constitutional right." Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996); see Hafner v. Brown, 983 F.2d 570, 577 (4th Cir. 1992). An essential element in any conspiracy to deprive the plaintiff of his constitutional rights is an agreement to do so among the alleged co-conspirators. Ballinger v. North Carolina Ag. Extension Serv., 815 F.2d 1001 (4th Cir. 1987). Without such a meeting of the minds, the independent acts of two or more wrongdoers does not amount to a conspiracy. Murdaugh Volkswagen v. First Nat'l Bank, 639 F.2d 1073 (4th Cir. 1981). Where the complaint makes only conclusory allegations of a conspiracy under § 1983 and fails to demonstrate any agreement or meeting of the minds among the defendants, the court may properly dismiss the complaint. See Woodrum v. Woodward County Okl., 866 F.2d 1121 (9th Cir. 1989); Cole v. Gray, 638 F.2d 804 (5th Cir. 1981).

Plaintiff alleges that Defendants McNally, Beard, Geissele, Smith, Clelland, Diggs, Glick and Parsons had a meeting of the minds to destroy and falsify Plaintiff's medical records. These vague and conclusory allegations are insufficient to state a conspiracy claim and will be dismissed for the reasons set forth in the Order on initial review of the Complaint.

 **(10)**   **North Carolina Claims**

The district courts have supplemental jurisdiction over claims that are so related to the claims over which the court has original jurisdiction that they "form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A court may decline to exercise supplemental jurisdiction if: (1) the claim raises a novel or complex issue of

state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction; or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction. 28 U.S.C. § 1367(c)(1)-(4).

Plaintiff appears to assert claims under North Carolina law against all of the Defendants. These claims will be dismissed insofar as the underlying § 1983 claims are insufficient to pass initial review. However, the Court will exercise supplemental jurisdiction over the North Carolina claims to the extent that the related § 1983 claims have passed initial review as to the relevant Defendants.

### V.  CONCLUSION

For the reasons stated herein, the Amended Complaint has passed initial review and will be permitted to proceed on Plaintiff's claims of: deliberate indifference to a serious medical need against Defendants **Bowden, Brathwaite, Brewton, Chung, Ford, Foreman, Goines, Kalinski, Maines, Mundle, Murphy, Ojeda, Polanco, Quinn,** and **Randle**; and supervisory liability against Defendants **Clelland, Glick,** and **Parsons**. The Court will exercise supplemental jurisdiction over the related North Carolina claims against these Defendants. The remaining claims are dismissed for failure to state a claim and as frivolous under § 1915(e)(2)(B)(i)-(ii).

**IT IS, THEREFORE, ORDERED** that:

1.  The Complaint will proceed against Defendants **Bowden, Brathwaite, Brewton, Chung, Ford, Foreman, Goines, Kalinski, Maines, Mundle, Murphy, Ojeda, Polanco, Quinn,** and **Randle** for medical deliberate indifference; against Defendants **Clelland, Glick,** and **Parsons** for supervisory liability, and the Court will exercise supplemental jurisdiction over the North Carolina claims that are related to the § 1983

29

claims that have passed initial review as to these Defendants.

2. The remaining claims are dismissed for failure to state a claim and as frivolous under § 1915(e)(2)(B)(i)-(ii).

3. **IT IS FURTHER ORDERED THAT** the Clerk of Court shall commence the procedure for waiver of service as set forth in Local Rule 4.3 for Defendants **Goines, Maines, Murphy, and Ojeda** and who are current or former employees of NCDPS.

Signed: March 30, 2019

Frank D. Whitney
Chief United States District Judge